### Fourth Court of Appeals
### San Antonio, Texas


## MEMORANDUM OPINION

No. 04-20-00140-CV

**IN THE INTEREST OF L.P. AND C.P.,** Children

From the 218th Judicial District Court, Atascosa County, Texas
Trial Court No. 18-10-1012-CVA
Honorable Melissa DeGerolami, Judge Presiding

Opinion by: Liza A. Rodriguez, Justice

Sitting: Rebeca C. Martinez, Justice
Luz Elena D. Chapa, Justice
Liza A. Rodriguez, Justice

Delivered and Filed: August 26, 2020

AFFIRMED

Mother and Father appeal the trial court's order terminating their parental rights to their children L.P. and C.P.[1]  Both parents argue the evidence is legally and factually insufficient to support the trial court's findings under section 161.001(b)(1) and (2).  Father also asserts the trial court abused its discretion in making its conservatorship finding.  We affirm.

### BACKGROUND

The children who are the subject of this case are L.P., a nine-year-old boy who is on the lower end of the autism spectrum, and C.P., an eight-year-old girl who is higher on the autism spectrum and non-verbal.  The Department of Family and Protective Services became involved in

---

[1] To protect the identity of the minor children, we refer to the parties by fictitious names, initials, or aliases.  *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

this case on October 4, 2018 after Father called 911 and stated, "I'm going to kill my kids." When Pleasanton police officers responded, Father explained he called 911 because the FBI would not listen to his story that multiple people were out to kill him and "they're going to kill my kids if that's what I needed to do to get you out here." Father specifically identified a man named "Mark" who had been following him and trying to kill him because he has knowledge about a murder. When asked if there was any family the children could stay with, Father replied he wanted them to be in CPS custody because that was the only way they would be safe. L.P. and C.P. were transported to the police station and later released to the Department. Father was arrested for Terroristic Threat (Family Violence). Father reiterated to the Department caseworkers that he did not want the children placed with family members because they would be safer in foster care. Department caseworker Amy Guel testified the children were removed because of "abuse or neglect in the home." The children were placed at Davidson Respite, an emergency shelter for children with particular needs, specifically autism.

A two-day bench trial was held on December 19, 2019 and January 14, 2020. In addition to the admission of multiple exhibits, five witnesses testified: Judy Dickey, the children's therapist; Dr. Jason Miller, the psychiatrist who evaluated both parents; Amy Guel, the Department caseworker; Joni Garcia, the CASA volunteer for the children; and Mother.

### *Children's Therapist*

Judy Dickey testified she was the therapist for the children from January 2019 through the beginning of trial in December 2019. She stated that L.P.'s therapeutic needs are increasing pro-social behavior, self-control, and anger management because he sometimes hits other children. During the course of the case he has improved a lot, showing increased empathy for others and sharing better, using words to seek help from adults instead of using his feet and hands when he gets angry, and acting less impulsively. By March 2019, L.P. was more controlled, more verbal,

and more polite. Dickey attributed his improvement to him being at Davidson. The consistency of his living and school environments during the last year of the case has resulted in a lot of positive changes. Dickey was concerned that L.P. might regress and withdraw back into his own world if he returned to an unstable environment with parents unequipped to deal with his particular needs and basic needs such as a sense of security and safety. L.P.'s particular needs are that he requires time and individual attention from his caregivers, patience, stimulation, and challenges. At first, L.P. was very focused on C.P.'s needs and not making her mad, instead of his own needs. Dickey acknowledged that L.P. feels sad and misses his parents and she has been working with him to help him learn to talk to others about how he feels. If the parents' rights were terminated, Dickey stated she believed she could help L.P. process the loss and work through it.

With respect to C.P., although she is non-verbal, she is very bright and headstrong. She is much more affectionate than at the beginning of the case and interacts well with other children. She has the same basic needs for security and safety as other children. Because C.P. is much higher on the autism spectrum than L.P., her particular needs are one-on-one attention from adults who know how to interact with children diagnosed with autism. Father does a really good job of working to communicate with her. Sometimes C.P. will utter sounds that seem like words. When C.P. gets frustrated, she escalates fast. The stability and consistency at Davidson have really helped her stay calm. She has learned to either sign or make a sound for "please" before she just grabs something. C.P.'s therapeutic goals are to improve her ability to communicate instead of screaming, mental stimulation, and interactions with others. Dickey stated that C.P. "has more capacity than any of us give her credit for" because while she has been in school she has made a lot of progress. Her demeanor and lack of language skills may be off-putting but she has the ability to connect with people and has developed a special attachment to a female staff member at Davidson.

Dickey facilitated visits between the parents and the children from June 2019 to November 2019. The visits were good overall. The parents would bring snacks and play with each child individually. Mother took redirection well and made great progress in her interactions with the children. Father was very bonded with the children, although he initially had to be redirected not to talk about certain things in front of the children. Both parents had a strong desire to get their children back and the children clearly expressed love for their parents and enjoyed the visits.

During the latter half of the year, some negative issues began to arise. In August or September, Dickey asked Mother if Father was abusing alcohol and she confirmed that he was drinking throughout the case, including before a visit. In October, L.P. told Dickey that his Father drank alcohol when they were talking about adults making bad choices. Dickey also asked Mother whether Father was using methamphetamine in November and Mother stated he was. The parents told Dickey they were being evicted from their home in September and thereafter housing became an issue in the case. Dickey was also aware of the "on again, off again" nature of the parents' relationship because Dickey received a "very upset" phone call from Mother in September or October. Mother told her she had an argument with Father and he took the car and left her at the Walmart in Kerrville without her wallet or a way home; she stated she was "done" with Father. The last time she spoke with the parents was at their visit in November and Father told her they were back together. Dickey had a subsequent conversation with Mother and asked her why she had returned to Father because she got the impression Mother was afraid. Mother replied that she had nowhere else to go. Dickey testified she felt Father had not been honest with her about his substance abuse, the parents' stability, and "how he treated" Mother.

As for their parental abilities, Dickey stated the one strength Mother and Father have is that the children love them and they love the children. She believed that the children want to return to their parents. Initially, Dickey really wanted the parents to be successful and was in favor of

reunification but changed her mind halfway through the case. Noting that adults' actions speak louder than their words, Dickey stated her fears for the children are that they will be in an environment where their parents or other people are abusing drugs or alcohol. C.P. is non-verbal and is therefore at high risk for being abused. For these reasons, Dickey did not believe the children should be returned to the parents. Although she stated it was a really hard decision, she had concluded that termination was in the best interest of the children. Dickey believed that L.P. could eventually work through the emotional distress of a termination and his safety and long-term health outweighed the emotional bond with the parents.

### Parents' Psychiatric Evaluations

Dr. Jason Miller performed psychiatric evaluations of both parents during the case. He assessed Father in January 2019 and his evaluation was admitted as Petitioner's Exhibit #19. With respect to the reason for the children's removal, Father told Dr. Miller he called 911 because there was a person in his yard, "Mark," who had been stalking him for a long time and was a danger to him. Father understood the Department did not believe this was true. Dr. Miller agreed there was a possibility it was true Mark had been stalking Father and, if true, it would change his impression of Father's symptoms. Father denied threatening to kill his children on the 911 call. Father also denied threatening the 911 operator, but conceded they had a "somewhat confrontational conversation." Father denied any problem with drug or alcohol use, but stated he attended AA "off and on" to support others who have a problem with alcohol.

Dr. Miller testified to his opinion that Father suffers from either delusional disorder or substance induced psychotic disorder which can arise from methamphetamine or cocaine use and may be permanent. Either mental health condition would negatively impact Father's ability to parent "special needs children" because "if left untreated that can have significant level of paranoia [which] would certainly interfere with your ability to interact with authority figures, schools,

perhaps physicians, and . . . certainly in his case law enforcement . . . ." Dr. Miller further stated either condition has the potential to endanger the children because "if you don't trust authority figures, if you don't trust police, if you don't trust physicians it could put you in a situation where you don't seek care at a time when it is desperately needed." Dr. Miller further stated that children on the autism spectrum require therapy and specific interventions at school to assist them with communication and developmental delays, leading to a fair level of interaction between the parents and the school. Dr. Miller recommended Father obtain psychiatric treatment for his mental health disorder(s) and one-on-one counseling to improve Father's ability to exercise rational coping skills. However, Father had not successfully completed therapy at the time of trial. Dr. Miller also recommended continued drug testing, and drug treatment if Father tested positive, because he suspected Father might be using a stimulant like methamphetamine or cocaine, which can lead to the types of symptoms Father exhibited. If Father was using drugs, he would be concerned about the impact on children in Father's care, especially children with autism.

Dr. Miller also reviewed the report of Dr. Jacob Pickard, a psychologist who previously evaluated Father. Dr. Pickard's report was admitted into evidence as Petitioner's Exhibit #16. Dr. Pickard observed that Father exhibited symptoms of psychosis, including paranoid delusions and auditory and visual hallucinations. Dr. Pickard diagnosed Father with schizophrenia, but also noted that a diagnosis of schizoaffective disorder might be more appropriate "if mood symptoms were more prominent than indicated." Dr. Miller testified he did not believe Father met the full criteria for schizophrenia. Dr. Pickard also noted that Father denied any illegal drug use, but Mother told him that Father uses methamphetamine and crack, as well as alcohol. Dr. Pickard also

noted that Father denied any blame for CPS's involvement with the family in California, although Mother told Dr. Pickard both of them were using drugs at the time.[2]

Dr. Miller evaluated Mother shortly before trial on December 9, 2019. His evaluation of Mother was admitted as Petitioner's Exhibit #20. Dr. Miller diagnosed her as suffering from major depressive disorder for a long time and noted she was currently being treated by a psychiatrist, with whom he recommended she continue treatment. Dr. Miller testified that if Mother's depression were to go untreated she could have uncontrolled mood symptoms which would impact her ability to parent, especially with "special needs children." Dr. Miller also recommended Mother continue to engage in one-on-one therapy. Although Dr. Miller noted Mother has a historical diagnosis of bipolar disorder, he did not believe she met the full criteria for that diagnosis. Mother reported having a history of using methamphetamine but stated she quit four years ago. Dr. Miller characterized Mother's substance abuse disorder as being in "sustained remission." Because of her history of drug use, he recommended she continue to be drug tested and seek treatment if she tested positive. Dr. Miller further recommended Mother engage in domestic violence classes based on her statements to Dr. Pickard, who performed her psychological assessment a year earlier in November 2018. Mother told Dr. Pickard that she and Father were sometimes violent with each other. When Dr. Miller asked her about domestic violence, Mother told him they had not had any physical altercations. Dr. Miller stated his concern was that, "if somebody is in a physically dangerous situation but is again not being forthright about it that raises the potential of them remaining in a dangerous situation even when it would be more prudent for them to leave or escape." Dr. Miller testified that witnessing domestic violence is very detrimental to any child's development, but that children with autism have particular difficulty

---

[2] As discussed later in more detail, a CPS case in California led to Father being given sole custody of L.P. and C.P. and Mother having supervised visitation.

understanding emotional interactions and would have difficulty processing such an emotionally charged interaction. Domestic violence includes physical violence as well as emotional abuse such as yelling, threatening, and name-calling and can also involve power and control issues. Dr. Miller agreed that if Father stranded Mother in another city with no way to get home or threatened to kill Mother during the case those actions would show domestic violence. Dr. Miller explained that stability and routine are especially important for children on the autism spectrum because they have difficulty adjusting to change. When he evaluated Mother in December 2019 she was living with Father.

### *Department Caseworker*

Amy Guel testified the Department became involved when Father called 911 and threatened to kill the children. There was no evidence the children had actually been physically abused or otherwise physically injured. Guel became the caseworker in January 2019 and continued in that role through the date of trial.

Mother admitted having a history of methamphetamine use but stated she had been clean for four years. She never had a positive drug test during the case and was diagnosed as being in sustained substance abuse remission. Father denied using illegal drugs and abusing alcohol, but had positive drug tests. Father underwent multiple drug and alcohol assessments during the case. Father's OSAR[3] evaluation in September 2019 showed he had a moderate to severe alcohol use disorder and denied the use of illegal drugs. In September 2019, after a positive hair follicle test for drugs on September 5, Father was referred to Mindful Innovations for intensive outpatient drug treatment but did not attend because he was assessed as needing more intensive treatment. Father explained the positive test result in September by stating a man put the drug in his food. Although

---

[3] OSAR is an acronym for an outreach, screening and referral service used by the Department.

Father was subsequently referred to Alpha Home, he did not attend because he and Mother wanted to attend together but she was clean and therefore not admitted. Mother and Father ultimately attended Lifetime Recovery together and completed the treatment program on December 11, 2019, one week before trial began. Father's last random drug test was a hair follicle test on December 5, 2019 which was positive for methamphetamine. Nevertheless, he was successfully discharged from Lifetime Recovery. Father explained the positive test on December 5 by stating Mother had sabotaged him. Guel testified that when she gave Mother a ride to the October 2019 permanency hearing, Mother told her Father was continuing to use methamphetamine and drink alcohol "quite often" during the case. Guel herself saw Father out in the community with alcohol on two occasions in September or October 2019.

Both parents have mental health illnesses. Guel testified Mother was being treated for bipolar disorder when the case began and was diagnosed with major depressive disorder during the case. Mother received therapy and psychiatric treatment, and took medication. Guel testified she received an email from Mother's therapist on November 15, 2019, one month before trial began, which stated Mother's "mental health is . . . not at all stabilized." The email was admitted as Petitioner's Exhibit #22.

Guel testified that Father denies any mental illness. Guel stated that during the case Father did not make any meaningful efforts to address his mental health condition or to alleviate the initial concerns that brought the children into the Department's care. Neither of Father's therapists were able to make a recommendation about termination because he attended only sporadically. Father could benefit from continued therapy, but would have to be open and willing to actually participate. Father was not honest with Guel about his methamphetamine use or alcohol abuse.

Guel testified Father made violent threats during the case and there is a history of domestic violence in the parents' relationship. Mother told Guel about an argument with Father at a

Kerrville Walmart in September 2019 after which he drove away and left her and some co-workers stranded in Kerrville without a ride home. In addition to Father's initial threat to kill the children, Father made other violent threats during the case. During the October 2019 car ride, Mother asked Guel whether she knew that Father had threatened to kill Guel if she kept the children away from him; Guel said she did. At the same time, Mother also told Guel that Father similarly threatened to kill Mother if she got the children back without him. Dickey had already told Guel about Father's threat on September 20, 2019; Guel took the threat against her life "very seriously" and filed a police report. In addition, the November 15, 2019 email to Guel from Mother's therapist stated, "[Father] doesn't allow her to do things alone. And when she does he grills her afterwards. She also said that she is very afraid of him and thinks he might hurt her again and/or try to take the kids from her if she does not stay with him." The therapist concluded, "Termination to me seems like the only course of action for this case regardless whether she stays or not." Guel testified Father completed the domestic violence class in May 2019.

During the pendency of the case, Mother and Father were ordered to engage in family services consisting of drug and alcohol assessments, random drug tests, psychological assessments, parenting classes, domestic violence classes, and maintaining stable housing and employment. Both only partially completed their family service plans because: neither had successfully completed individual therapy; they failed to maintain stable housing during the case; and Father continued to abuse drugs and alcohol. At the time of trial, both Mother and Father were continuing individual therapy with new therapists they started seeing in October 2019, two months before the beginning of trial. As of the second day of trial on January 14, 2020, Father had only seen his therapist twice, having missed a January 7th appointment because he and Mother were "checking into a hotel." Guel testified she was aware of at least five different places that Mother and Father lived in various cities, either together or separately, during the approximately 15 months

the case was pending: an apartment in Pleasanton from which they were evicted; at Haven for Hope homeless shelter in San Antonio; when they were separated in October 2019, Mother lived with a man in San Antonio; in November 2019, Mother and Father lived together in a friend's trailer home in Poteet; and most recently, Guel met with them at an extended stay hotel on January 7, 2020. When Mother testified at trial in January that she and Father had been living in an apartment for "the past three months," that was the first time Guel heard about a new apartment. Both Mother and Father received social security disability income and worked part-time for a temp agency.

All the visits between the parents and the children were very good, with the parents spending one-on-one time with each child and then switching without direction. Both children are very bonded to their parents and the parents love the children. The case was extended beyond the typical one-year time period based on extraordinary circumstances due to the strong bond between the children and parents. *See* TEX. FAM. CODE ANN. § 263.401. Despite being initially upset and sad about the separation, both children were making significant progress at the Davidson shelter and had emotionally bonded with staff members and other children there. C.P. has become more calm and independent and is trying to say "please" and "thank you." L.P. can communicate more comfortably with adults now, is very engaged in play, and is more talkative. Although Davidson is an emergency shelter, an accommodation was made so that L.P. and C.P. can stay there as long as needed due to their disabilities. The Department's permanency goal for the children is an unrelated adoption. A Davidson staff member's family is interested in adopting them and is in the process of getting licensed.

### CASA Advocate for the Children

Joni Garcia has been the director of CASA for twenty years and served as the CASA advocate for the children in this case. Garcia observed the parents' visits with the children and

they were always appropriate and very good. The children were extremely happy to see their parents. L.P. is strongly bonded with Father and often said he missed his dad. Father also knew how to calm C.P. when she got upset. Garcia stated she believed the children want to be reunited with their parents. Initially, Garcia was a strong advocate for reunification, but she changed her mind after Father's positive tests for methamphetamine and alcohol. According to Garcia, the fact that the children were able to form emotional bonds with other adults at Davidson and at school showed the children are capable of moving forward with different adults. When the Department's permanency plan became termination and adoption by a non-relative, Garcia became supportive of that plan. She testified that termination is in the children's best interest.

Garcia only observed the parents' personal relationship when they were interacting with the children. But, she remembered that Mother called her in September 2019 and told her she was no longer with Father because he had left her at Walmart and he had not been honest with Garcia, Guel, and Dickey about his drug use, alcohol use, and controlling behavior toward Mother. However, Mother reconciled with Father not long after the conversation. In Garcia's opinion, Mother cannot operate independently of Father. Garcia expressed concern for the children based on the instability of the parents' relationship.

Another reason Garcia recommended termination was that the children had shown great progress during the case. When they initially came into the Department's care, L.P. was very quiet and withdrawn and did not talk very much. C.P.'s method of communication was to scream and throw herself on the floor; she was "very tense and very unhappy." As of the time of trial, both children had progressed emotionally and academically and "come a long way." Garcia observed that the children reacted well to security and stability, and there was a lot of instability in the parents' home life. The children are also receiving a lot of support at Davidson and are happy.

*Mother*

Mother testified she had prior CPS history in California. She lost custody of L.P. based on an allegation that she abandoned him when he was nine days old. Mother explained she only left L.P. with a friend for a while, but the person reported her for abandonment and "set her up." As part of that case, Mother completed a drug abuse outpatient program and individual therapy, and saw a psychiatrist for medication management. When C.P. was born about one year later, Mother had to sign a safety plan stating she could not be alone with any child. Mother stated she did not recall whether there was any CPS involvement with C.P. in California. Father has had sole custody of L.P. and C.P. for the last nine years. The current case is her first involvement with the Department in Texas. When Father was arrested for Terroristic Threat in October 2018, the Department contacted her to determine whether the children could be placed with a family member since they could not be placed with Mother.

Mother acknowledged having a history of methamphetamine use but testified she had been clean for five years. As part of her family service plan in this case, she completed outpatient substance abuse treatment through Lifetime Recovery in December 2019 even though she never had a positive drug test. Mother also completed parenting classes for children with autism and domestic violence classes. Mother testified the last time there was violence in the relationship was several years before. Mother remembered having an argument with Father in October 2019 when he left her and two other Walmart employees without a ride home from Kerrville. Father apologized and reconciled with her after that incident. Mother denied that Father used drugs in her presence and denied telling Dickey that Father was using drugs during the case. She also denied that Father used alcohol in her presence during the case and denied reporting he did. Mother testified that before the children were born, she reported Father to the FBI because he was dealing Oxycontin. She was not aware of any person named "Mark" who was following Father. Mother

did not recall telling Dr. Pickard about a 2015 incident in which she and Father were using methamphetamine and C.P. swallowed some crystal methamphetamine.

Mother had a psychological evaluation with Dr. Pickard in 2018 and a psychiatric assessment with Dr. Miller in December 2019. She was referred to several therapists during the course of the case and began seeing her current therapist in October 2019. She was still engaged in weekly therapy at the time of trial. Mother was taking medication as prescribed by her current treating psychiatrist. She was previously diagnosed as having bipolar disorder, but Dr. Miller told her she was experiencing severe depression and not bipolar disorder. She receives SSI disability payments based on her mental health condition.

When she testified in January 2020, Mother was living with Father in an apartment in San Antonio. She stated they had been living there for three months, but also stated she stayed in a hotel in December because a deposit was required for the apartment. Before moving into the apartment, she had stayed with friends in Poteet for a month, at various hotels, and at Haven for Hope homeless shelter in San Antonio. When the case began in October 2018, she was living in her own apartment and was not together with Father. She and Father became a couple again in January 2019 and she moved in with Father in Pleasanton in March 2019. Mother stated that between March 2019 and January 2020 she lived in three or four different places. Mother left Father in October after the incident when he left her in Kerrville, but got back together with him in November after he apologized. As of the date of trial, they were living together as a married couple.

Mother denied that Father threatened her at any time during the case and denied telling Garcia and Guel that he had, suggesting she was angry with Father after the October 2019 incident. Mother explained that she lies when she is angry with Father. Mother also denied any knowledge of Father threatening Guel's life and denied telling anyone about such a threat. Mother testified

she did not recall telling Dr. Pickard that there was a history of domestic violence in her relationship with Father, but later conceded there was no reason to doubt the honesty of her statements to him. When specifically asked whether she told Dr. Pickard that Father "would punch [her] in the face, choke [her] by the neck, kick [her] in the legs, and kick [her] in [her] private parts," Mother stated she did not recall. She also did not recall telling Dr. Pickard that L.P. would witness these acts of violence and cover his eyes or hide. When asked whether she puts the children's needs above her husband's needs, Mother replied that both sets of needs are equal.

According to Mother, Father is a loving, caring, bonded parent to the children and they were always well taken care of in Father's home. Mother testified her parental abilities improved a lot through the parenting and autism classes. She believed that termination would adversely affect the children psychologically and emotionally because they love their parents. Mother requested that their parental rights not be terminated so they could all work together for reunification. Mother agreed, however, that the children were doing well at Davidson and are well-loved there.

After hearing all the evidence, the trial court found the following predicate grounds under section 161.001(b)(1) support termination of both sets of parental rights: subsections (E) and (O) as to Mother, and subsections (D), (E), and (O) as to Father. *See* TEX. FAM. CODE ANN. §161.001(b)(1)(D),(E),(O). The trial court also found that termination of the parental rights of Mother and Father is in the best interests of L.P. and C.P. *Id.* § 161.001(b)(2). Both parents appeal.

### STANDARD OF REVIEW

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence that parental rights should be terminated pursuant to one of the predicate grounds in subsection 161.001(b)(1) and that

termination of parental rights is in the best interest of the child. Tᴇx. Fᴀᴍ. Cᴏᴅᴇ Aɴɴ. § 161.001(b)(1), (2). In reviewing the legal sufficiency of the evidence to support these findings by the trial court, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In reviewing the factual sufficiency of the evidence, we consider the disputed or conflicting evidence. *Id.* at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under these standards, the trial court is the sole judge of the weight and credibility of the evidence. *Id.*

## Pʀᴇᴅɪᴄᴀᴛᴇ Gʀᴏᴜɴᴅs

### *Endangerment: Subsection (D) and (E) Grounds*

When a parent raises an appellate issue challenging findings under subsection (D) and/or subsection (E), we must address those grounds because of the potential future consequences for parental rights to another child. *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (an endangerment finding under (D) or (E) may be used in a future termination proceeding involving a different child; therefore, if challenged on appeal, (D) and (E) must be reviewed regardless of whether sufficient evidence exists to support another predicate ground).

Subsection (D) permits termination of parental rights if, along with a best-interest finding, the factfinder finds by clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tᴇx. Fᴀᴍ. Cᴏᴅᴇ Aɴɴ. § 161.001(b)(1)(D). Under subsection (D), the trial court examines "evidence related to the environment of the children to

determine if the environment was the source of endangerment to the children's physical or emotional well-being." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). "Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child." *Id.* "For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child." *Id.* "Parental and caregiver illegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being." *Id.* "A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards." *In re C.J.G.*, No. 04-19-00237-CV, 2019 WL 5580253, at *2 (Tex. App.—San Antonio Oct. 30, 2019, no pet.) (mem. op.) (quoting *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)). "[A] parent need not know for certain that the child is in an endangering environment, awareness of such a potential is sufficient." *Id.* (quoting *In re R.S.-T.*, 522 S.W.3d 92, 109 (Tex. App.—San Antonio 2017, no pet.)).

Subsection (E) permits termination of parental rights if the trial court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Under subsection (E), the trial court must determine "whether there is evidence that a parent's acts, omissions, or failures to act endangered the child's physical or emotional well-being." *In re C.J.G.*, 2019 WL 5580253, at *2.

Under both subsections, "endanger" means "to expose a child to loss or injury, or to jeopardize a child's emotional or mental health." *Id.* at *3 (citing *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996)). "However, there are some distinctions in the application of subsections (D) and (E)." *Id.* (citation omitted). Termination under subsection (D) may be based upon a single act or

omission. *Id.* at \*3 (citing *In re R.S.-T.*, 522 S.W.3d at 109). In contrast, termination under subsection (E) "may not rest on a single act or omission; it must be 'a voluntary, deliberate, and conscious course of conduct.'" *Id.* (quoting *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)). Additionally, "[i]n evaluating endangerment under subsection D, we consider the child's environment *before* the Department obtained custody of the child.'" *Id.* (quoting *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)) (emphasis added). "'Under subsection E, however, courts may consider conduct *both before and after* the Department removed the child from the home." *Id.* (quoting *In re S.R.*, 452 S.W.3d at 360) (emphasis added).

An endangerment finding often involves physical endangerment, but the statute does not require that the parent's conduct be directed at the child or that the child suffer actual injury." *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at \*5 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.). "Rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone." *Id.* (citation omitted). "Conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *Id.* "Thus, evidence of illegal drug use by a parent and its effect on a parent's life and her ability to parent may establish an endangering course of conduct under subsection (E)." *Id.*; *see In re J.O.A.*, 283 S.W.3d at 346 (holding evidence sufficient to support finding of endangerment even though father had made significant recent improvements because "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices"); *In re K-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.) ("A parent's use of drugs and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("Because it exposes the

child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E).").

### *Mother*

Mother argues on appeal that the evidence is legally and factually insufficient to support the trial court's endangerment finding against her under subsection (E). We must determine whether there is clear and convincing evidence from which the trial court could have found that Mother engaged in a voluntary, deliberate, and conscious course of conduct, whether by her acts or omissions, that endangered the children's physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(b)(1)(E); *In re C.J.G.*, 2019 WL 5580253, at *2.

There was considerable evidence that the relationship between Mother and Father involved physical violence and verbal threats by Father against Mother as well as the children. Mother testified she was aware that Father threatened to kill the children at the time they were removed. In addition, Guel testified that Mother told her that Father threatened to kill her as well as Mother if the case did not turn out as he wanted. Dr. Moore testified that Mother told Dr. Pickard that Father "would punch [her] in the face, choke [her] by the neck, kick [her] in the legs, and kick [her] in [her] private parts," and that L.P. "would witness these acts of violence and cover his eyes or hide." Dr. Miller also opined that if Father stranded Mother in another city with no way to get home or threatened to kill Mother during the case those actions are evidence of domestic violence. Guel testified that Mother's therapist believed Mother stayed with Father because she was "very afraid of him." Mother's subsequent denials of Father's threats and domestic violence in the home during her trial testimony created a conflict in the evidence for the trial court to resolve based on its assessment of the witnesses' credibility. *See In re C.J.Y.*, No. 04-20-00009-CV, 2020 WL 3441248, at *5 (Tex. App.—San Antonio June 24, 2020, pet. denied) ("[a]s the finder of fact and sole judge of the credibility of the witnesses, the trial court was free to disregard any or all of

[Appellant Mother's] self-serving testimony."). The trial court could have disbelieved Mother's contradictory testimony and chosen to believe that there was on-going domestic violence by Father and that Mother consciously chose to stay in that violent environment despite the danger to the children. Dr. Miller testified that witnessing domestic violence is very detrimental to any child's development, but that children with autism would have particular difficulty emotionally processing such a highly-charged interaction. *See In re J.T.G*, 121 S.W.3d at 125 (a parent's violent conduct creates an environment that endangers the physical and emotional well-being of a child).

In addition, even though she later denied it, there was evidence that Mother knew Father was continuing to use illegal drugs and abuse alcohol during the pendency of the case and chose to stay in, or repeatedly returned to, the relationship and home with him. Guel testified Mother told her that Father continued to use methamphetamine and abuse alcohol during the case and Guel herself observed Father with alcohol. Father tested positive for methamphetamine use shortly before trial. Again, Mother's subsequent denials that she told Guel that Father continued to use illegal drugs and abuse alcohol during the case created a conflict in the evidence and a credibility issue for the trial court to resolve. *See In re C.J.Y.*, No. 04-20-00009-CV, 2020 WL 3441248, at *5. The trial court could have concluded that the evidence showed Mother was aware of Father's continued illegal drug use and alcohol abuse in the home and yet chose to disregard the risk of danger those habits posed to the children's physical and emotional well-being. *See In re K.J.G.*, 2019 WL 3937278, at *5 (a parent's illegal drug use may establish an endangering course of conduct under subsection (E)); *see also In re K-A.B.M.*, 551 S.W.3d at 287. Dickey expressed her fears for the children's safety and well-being within an environment where drug and alcohol abuse is present, noting that C.P. was at especially high risk for being abused because she is non-verbal.

The evidence also revealed that Mother and Father had an "on again, off again" pattern in their relationship, with Mother periodically leaving Father and then returning to live with Father.

Mother and Father also did not have consistent housing, living in multiple dwellings and multiple cities, both together and apart, during the 15-month pendency of the case. The inconsistency of the parents' relationship and the instability of the parents' housing is evidence of a course of conduct by Mother in which she failed to provide a safe, secure, and stable home environment for L.P. and C.P. and instead endangered their physical and emotional well-being. *See In re K.J.G.*, 2019 WL 3937278, at *5 (parent's conduct that subjects child to a life of uncertainty and instability endangers the child's physical and emotional well-being). Dr. Moore testified that children on the autism spectrum have a particular need for stability and routine because they have difficulty adjusting to change. Dickey testified that a child's basic needs are for security and stability, and that the consistency of their living and school environments at Davidson during the last year had resulted in a lot of positive improvement by both children. Garcia also observed that L.P. and C.P. made tremendous progress and reacted well to the security and stability provided at Davidson. She testified there was a lot of instability in the parents' relationship and home life and she expressed concern for the children's well-being within such an unstable environment.

Based on the above evidence, the trial court could have concluded that Mother's course of conduct before and during the case showed that she was either not willing to or incapable of protecting the children from the danger and instability present in their home life with Father. Garcia testified to her observation that "Mother cannot operate independently of Father." Guel opined that Mother, as well as Father, lacks "sufficient protective capabilities" to care for and meet the children's particular needs long term due to the instability of the home. Dr. Miller testified that when he asked Mother whether she puts the children's needs above Father's needs, Mother stated she considered both sets of needs to be equal. The trial court could have construed Mother's denials at trial about the existence of domestic violence and drug and alcohol abuse in the home as Mother's attempt to protect Father at the expense of the children's safety. Dr. Miller also noted

that children on the autism spectrum require therapy and special interventions at school to assist them with communication and developmental delays, which necessarily involves a fair level of interaction between the parents and the school. Given Father's lack of trust for authority figures like teachers, doctors, and police, Dr. Miller stated it could lead to a situation where a parent would fail to seek assistance or care for the children when it was needed. Based on the evidence showing Mother's fear of Father, the trial court could have concluded she was not capable of engaging in the level of support and protection required to safeguard the physical and emotional well-being of L.P. and C.P.

We conclude the evidence supports the trial court's finding that Mother engaged in a conscious course of conduct that endangered the children by staying in and/or repeatedly returning to a relationship with Father that involved domestic violence, on-going substance abuse by Father, and unstable housing. We therefore hold the evidence is both legally and factually sufficient to support the trial court's endangerment finding under subsection (E) as to Mother. *See In re K.J.G.*, 2019 WL 3937278, at *5 (parent's endangering conduct need not be directed at the child; the specific danger to the child's well-being may be inferred from the parent's conduct).

### *Father*

Father argues the trial evidence is legally and factually insufficient to support the trial court's findings of endangerment against him under both subsections (D) and (E).

With respect to the finding under (D), there was testimony by Guel that Father made a threat to kill the children during his call to 911 which caused the Department to remove the children for their safety. Although the children did not suffer actual physical injury, endangerment includes exposing a child to potential physical or emotional or mental injury. *In re M.C.*, 917 S.W.2d at 269. Father admitted to Dr. Miller that he knowingly and consciously made the threat so the police would take him seriously. Father agreed the 911 call was "confrontational," but denied he

threatened the 911 operator as suggested by Dr. Miller's records. Father made two more violent threats during the case as well: to kill the caseworker; and to kill Mother. In addition, there was evidence that Father was physically abusive to Mother in the home and that L.P. had witnessed at least one incident of domestic violence. Violent conduct by a parent can create an environment that endangers the physical and/or emotional well-being of a child. *In re J.T.G*, 121 S.W.3d at 125.

In addition, Guel testified that Father had positive drug tests during the case, including a few weeks before trial, and that Mother told her that Father continued to use methamphetamine and abuse alcohol during the case, including drinking alcohol before a visit with the children. A parent's illegal drug use can support a finding that a child's surroundings endanger his physical or emotional well-being. *Id.* Here, the evidence showed that Father created an environment with the potential for danger to the children, the risk of which he consciously disregarded. *In re C.J.G.*, 2019 WL 5580253, at *2. The contradictory testimony by Mother, denying she said that Father threatened her and the caseworker and continued to use methamphetamine and drink alcohol, presents a credibility issue on which we defer to the trial court to resolve the conflict in the evidence. Thus, we conclude the evidence is legally and factually sufficient to support the trial court's finding that Father's conduct involving threats of violence toward the children and Mother as well as his continuing substance abuse endangered the children under subsection (D).

With respect to the endangerment finding under (E), the evidence must show that Father engaged in a voluntary, deliberate, and conscious course of conduct, whether by acts or omissions, that endangered the children's physical or emotional well-being. Father's actions in making a series of violent threats to kill the children, Mother, and the caseworker before and during the case tend to show a deliberate course of endangering conduct under (E). Father's continued illegal drug use and alcohol abuse during the case similarly show a deliberate course of conduct, despite

opportunities to obtain treatment and rehabilitation, to continue with a lifestyle involving illegal drug use that endangers the children. *See In re K-A.B.M.*, 551 S.W.3d at 287; *In re K.J.G.*, 2019 WL 3937278, at \*5. As Garcia noted, C.P. is particularly vulnerable to being abused because she is non-verbal. In addition, the evidence established that Father's housing situation was unstable and inconsistent during the case, with him staying in various cities, hotels, shelters, with friends, and in his own apartment within a span of 15 months. A parent's conduct that exposes a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re K.J.G.*, 2019 WL 3937278, at \*5; *see In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.) (parent does not have to engage in the endangering conduct in the presence of the child). We conclude the evidence is legally and factually sufficient to show that Father voluntarily engaged in a course of conduct that endangered the physical and emotional well-being of the children under subsection (E).

Having concluded that legally and factually sufficient evidence exists to support the trial court's findings under subsection (D) and (E) as to Father, and under subsection (E) as to Mother, we need not address their appellate issues related to the trial court's findings under subsection (O) for failure to complete their family service plans. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (only one statutory ground is necessary to support a judgment terminating parental rights when there is also a finding that termination is in the child's best interest).

## BEST INTERESTS OF THE CHILDREN

Both Mother and Father assert the evidence is legally and factually insufficient to support the trial court's findings that termination of their parental rights is in the best interests of L.P. and C.P. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Under Texas law, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In determining whether the child's parent is willing and able to provide the

child with a safe environment, a court should consider the factors set out in section 263.307 of the Family Code. *See* TEX. FAM. CODE ANN. § 263.307(b).[4] In addition to these statutory factors, in considering the best interest of the child, a court may also consider the nonexclusive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).[5] The *Holley* factors are neither all-encompassing nor does a court need to find evidence of each factor before terminating the parent-child relationship. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). In determining whether termination of the parent-child relationship is in the best interest of a child, a court may judge a parent's future conduct by his or her past conduct. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Finally, evidence establishing one or more of the statutory grounds for termination may also be probative of best interest, although it does not relieve the Department of its burden to prove best interest. *In re C.H.*, 89 S.W.3d at 28.

---

[4] These factors include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE ANN. § 263.307(b).

[5] These factors include, but are not limited to, the following: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013) (citing *Holley*, 544 S.W.2d at 371-72).

Here, as discussed above, there is clear and convincing evidence that both Mother and Father are engaged in a course of conduct that endangers the children's physical and emotional well-being by creating a chaotic and unsafe home with threats of violence against the children, domestic violence against Mother, illegal drug use by Father, and a lack of stable and consistent housing. Despite opportunities to enact positive personal and environmental change, the parents failed to take advantage of the opportunities during the case and the same concerns existed at the time of trial. These factors weigh in favor of termination being in the children's best interest. *See* TEX. FAM. CODE ANN. § 263.307(b) (7), (8), (11), (12)(D), (E). In addition, while Mother was receiving psychiatric treatment and taking medication for her mental health condition(s), her therapist stated her mental state was "not at all stabilized" as of the month before trial. Father was also diagnosed with serious mental health condition(s), but was in denial and only sporadically participated in therapy and continued to abuse illegal drugs which contributed to his paranoid delusions. This factor also weighs in favor of termination being in the children's best interests. *Id.* § 263.307(b)(6). Further, Mother had a prior CPS history involving L.P. which caused her to lose custody of him to Father when he was only nine days old. When C.P. was born, Mother had to sign a safety plan agreeing she could not be alone with any child. This history weighs in favor of termination being in the children's best interests. *Id.* § 263.307(b)(4).

On the other hand, the evidence was undisputed that there is a strong, loving bond between the parents and the children. The children's desires are to be reunified with the parents. The parents also expressed a strong desire to be reunited with the children. Mother made great progress with her parental abilities during the case and Father and L.P. are strongly bonded and he has the ability to calm and communicate well with C.P. However, the children have particular vulnerabilities and specific needs that the evidence showed the parents were not able to meet sufficiently. Both children have made great improvements at Davidson, both academically and

emotionally. Despite being sad and missing their parents, both children have been able to form bonds with other adults at Davidson. There is a Davidson staff member's family who wants to adopt both children together, but the family has not yet been licensed. The staff at Davidson have agreed to keep L.P. and C.P. as long as needed to maintain the stability and security that has proven important to them.

With respect to whether Mother and Father have the parental abilities to meet the children's particular needs, Guel did not believe the parents have sufficient protective capacities to care for and meet their needs long term due to the instability of the home. The parents did not take advantage of the services offered during the case to make significant improvements in their parental abilities. Guel testified the biggest barriers to returning the children to the parents are instability, the parents' volatile relationship, and the parents' lack of honesty about the existence of domestic violence in the home and on-going drug and alcohol abuse by Father. The same dangers existed at the time of trial as existed when the children came into the Department's care. Guel stated, "When there is that much chaos in a home [the parents] are not going to be able to protect their children." In Guel's opinion, the danger posed by the instability outweighs the danger of the emotional harm to the children from being separated from their parents. The barriers to reunification with Mother specifically are "stability, protective capacities, and mental health."

Similarly, Garcia testified she was unsure the parents could maintain the children's positive progression if they were reunified. Garcia did not recommend permanent managing conservatorship by the Department without termination because the children are relatively young, have been through a lot, and have a good chance at permanent adoption. In addition, Garcia stated the parents had not shown enough progress during the lengthy case, particularly with respect to addressing their mental health conditions and Father's substance abuse. Although the family bond is strong, the children were behind in school and could not communicate well at the beginning of

the case. "Something that should have happened wasn't happening" in the home and "now it's happening" at Davidson. She noted that while the parents' visits with the children were wonderful and full of laughter, the visits take place in a controlled environment for a minimal amount of time. Garcia acknowledged that losing contact with their parents will emotionally affect the children but stated that leaving the security of Davidson and going back into an unstable home would also adversely affect them.

The main concerns that led the Department caseworker, CASA volunteer, and the children's therapist to recommend termination of both parents' rights were Father's continuing illegal drug use and threats of physical violence, the instability of the home environment due to the volatile, unstable nature of the parents' relationship which included domestic violence, the lack of stable and consistent housing, and Father's unacknowledged and untreated mental health condition. When combined with the children's particular needs, including for individual attention and development, stability, and security, these on-going concerns which persisted throughout the case support the trial court's finding that termination of both parents' rights is in the children's best interests.

## CONSERVATORSHIP

Finally, Father asserts that if the termination order is reversed, the issue of conservatorship of the children should be reconsidered. Because we are affirming the trial court's termination order, we need not address the conservatorship issue. *See In re C.J.Y.*, 2020 WL 3441248, at *7.

## CONCLUSION

Based on the foregoing reasons, we affirm the trial court's order terminating the parental rights of Mother and Father.

Liza A. Rodriguez, Justice